UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**MEMORANDUM, ORDER & JUDGMENT**

FAITH KRAMER,

                    Plaintiff,

          – against –

NEW YORK CITY BOARD OF
EDUCATION,

                    Defendant.

09-CV-1167

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ **MAY 2 0 2010** ★

BROOKLYN OFFICE

**JACK B. WEINSTEIN, Senior United States District Judge:**

**Appearances:**

For Plaintiff:     DUANE C. FELTON
                   805 Castleton Avenue
                   Staten Island, NY 10310

For Defendant:     CORPORATION COUNSEL OF THE CITY OF NEW YORK
                   100 Church Street
                   New York, NY 10007
                   By:   BLANCHE GREENFIELD

### Table of Contents

| | | |
|---|---|---|
| I. | Introduction | 2 |
| II. | Facts | 4 |
| III. | Law | 20 |
| A. | Summary Judgment | 20 |
| B. | First Amendment | 21 |
| 1. | Official Speech of Public Employees | 23 |
| 2. | Student Speech | 23 |
| 3. | Teachers' Classroom Speech | 25 |
| C. | Due Process | 26 |
| 1. | Procedural Due Process | 26 |
| 2. | Notice and Vagueness | 28 |
| D. | New York State Law | 30 |

| | | |
|---|---|---|
| 1. | Breach of Contract | 30 |
| 2. | Negligent Supervision | 30 |
| IV. | Application of Law to Facts | 31 |
| A. | First Amendment | 31 |
| 1. | Public Employee Speech Standard | 31 |
| 2. | Student Speech Standard | 31 |
| B. | Due Process | 33 |
| 1. | Procedural Due Process | 33 |
| 2. | Lack of Notice and Vagueness | 35 |
| a. | The Plain Terms of Chancellor's Regulation A-421 and Reasonable Opportunity to Know What Is Prohibited. | 37 |
| b. | Reasonableness of Plaintiff's Conduct | 39 |
| i. | Nature of the Sexually Explicit Terms Used | 40 |
| ii. | Publicized Uses of Sexually Explicit Terms | 41 |
| iii. | Sexually Explicit Terms in Fiction Assigned in Schools | 44 |
| iv. | Sexually Explicit Terms in Sexuality and HIV/AIDS Education | 47 |
| c. | Explicit Standards for Application | 55 |
| d. | Regulation A-421 Was Applied to Ms. Kramer | 56 |
| C. | State-Law Claims | 59 |
| 1. | Breach of Contract | 59 |
| 2. | Negligent Supervision | 59 |
| V. | Conclusion | 60 |
| Appendix A: | Glossary of Relevant Sexual Terms | 61 |
| Appendix B: | Student Notebook Pages | 65 |

## I.    Introduction

To a senior judge, father, and grandfather, educated in the New York City public schools, there appears to be no more daunting undertaking than discussing sex and HIV/AIDS with a class of female and male thirteen- and fourteen-year-old eighth grade students. Executing such a task would require great sensitivity, skill, commitment, and not a little courage. This mission was given to plaintiff Faith Kramer, a veteran city school teacher of twenty-six years, holder of bachelor's and master's degrees in education from Brooklyn College and a 6th year certificate

from Staten Island College, with no blemish in her outstanding record as a teacher of young adolescents.

Ms. Kramer was provided with a syllabus that directed that students be encouraged to use terms they understood. In the classroom discussion students uttered the somewhat vulgar words they knew. Because her charges departed from the nomenclature of polite discussion, Ms. Kramer was removed from the classroom, kept in non-teaching detention for eight months, investigated, provisionally determined by her principal to have committed a serious violation of a school regulation, denied a satisfactory rating for the school year, and deprived of the extra income she had previously been earning from extra "per session" assignments. Ultimately, the charge of violating school regulations was not pursued, and plaintiff was never brought up on formal disciplinary charges. She has been reinstated to her classroom duties.

She sues defendant, the New York City Board of Education (the "Board"), alleging that she was improperly removed from the classroom, investigated, and deprived of per session work. Claimed are violations of her constitutional rights under the First and Fifth Amendments, breach of contract, and negligent supervision. Plaintiff's reliance on the Fifth Amendment is construed as an invocation of the Fourteenth Amendment, because the latter applies to due process violations or takings by state rather than federal actors. Constitutional claims are brought under sections 1983 and 1988 of title 42 of the United States Code. Expungement of adverse records, monetary damages, attorney's fees, and costs are sought.

By motion for summary judgment the Board seeks dismissal of the suit. Its motion is denied with respect to Ms. Kramer's claim that the school regulation invoked by the Board was inapt and unconstitutionally vague as applied. The Board's motion is granted with respect to her other claims.

– 3 –

The regulation relied upon by the Board did not prohibit Ms. Kramer's conduct.  It appears to have been selected *post hoc*, long after her suspension, to justify the measures that had been taken in response to parents' complaints.  Based on the regulation, this teacher ought never to have been removed from the classroom.  If she had not been kept from the classroom, she was likely to have received a satisfactory rating for the 2007-2008 school year, and would have continued to obtain additional income from per session assignments.  Her requests for compensation, expungement, fees, and costs survive.

The State of New York requires some sex education as essential for this pubescent student age-group, in view of the serious public health consequences resulting from lack of knowledge of HIV/AIDS and its modes of transmission.  The issue posed by this case is not whether language deemed more appropriate to the setting would be desirable; this is a matter for the Board, not the court, to determine through its regulations, curricula, and teaching guides.  *See Bartels v. Iowa*, 262 U.S. 404, 412 (1923) (Holms, J., dissenting) ("No one would doubt that a teacher might be forbidden to teach many things[.]").

If the Board of Education wants its teachers to instruct adolescents about HIV using Latinism of the academy, excluding vulgarism of the street, it should tell them so, plainly.  Instructors in the position of plaintiff are entitled to know what the rules are before they are sanctioned for going beyond unmarked boundaries they reasonably believed did not exist.  The substantial weight of pedagogical literature and other authorities, as well as the broad discretion granted by the Board, support the *bona fides* of this teacher's approach under these circumstances.

**II.    Facts**

Ms. Kramer is a forty-eight-year-old, tenured, state-licensed, twenty-six-year veteran teacher in the New York City public schools.  *See* May 6, 2010 Hr'g Tr. at 22 ("Hr'g Tr."); Pl.'s

Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. ("Pl. Mem.") at 3; Pl.'s Supplemental Aff. in Opp'n to Mot. for Summ. J. ("Pl. Supp. Aff.") ¶ 2.  She grew up and attended New York City public schools in Brooklyn. Hr'g Tr. 22. Her two sons, now nineteen and twenty-two, both attended New York City public schools in Staten Island. Hr'g Tr. 22-23. She graduated from Brooklyn College with bachelor of science and master's degrees in physical education specializing in secondary education, received a 6th year administrative certificate from the College of Staten Island, and completed advanced coursework in physical and health education at Brooklyn College. Pl. Supp. Aff. ¶¶ 3-5. The school system provided specific training in sex education, which she completed. Hr'g Tr. 23.

Prior to the incident that is the subject of this litigation, Ms. Kramer had received a satisfactory rating ("S")—the highest possible—in every year since she began receiving annual reviews in 1990. Pl. Supp. Aff. ¶ 9. In performance evaluations she has been recognized and commended for "facilitat[ing] student involvement in the lesson, [by] exhibit[ing] good listening skills, display[ing] interest and ask[ing] many questions," "develop[ing] an excellent working rapport with [ ] students," "demonstrat[ing] a desire to get students actively involved in the lesson," "us[ing] the chalkboard effectively," "engaging students in collaborative work," "engaging [students] in 'accountable talk,'" "present[ing] information and ideas clearly," and "us[ing] class time effectively and work[ing] in a very organized fashion." *See* Pl. Supp. Aff. Ex. 2 (letters of commendations and observations of plaintiff's teaching).  Ms. Kramer has received accolades from school administrators, recognizing her efforts and dedication in leading graduation ceremonies and coordinating school science fairs. *See id.* From 2002 to 2006, she once served as Dean of Students at her present school. Pl. Supp. Aff. ¶ 7.

New York State Education Commissioner Regulations require HIV/AIDS awareness instruction in every grade that is "accurate . . . age appropriate and consistent with community values." N.Y. Comp. Codes R. & Regs. tit. 8, § 135.3(b)(2). The Board provides teachers with an HIV/AIDS Curriculum, containing lesson plans for each grade. *See* Feb. 12, 2010 Decl. of Pinar Ozgu ("Ozgu Decl.") Ex. D (New York City Department of Education's HIV/AIDS Curriculum). Ms. Kramer's instruction conformed to these lesson plans.

In February 6, 2008, Ms. Kramer gave a mandatory HIV/AIDS lesson to her eighth-grade class. *See* Ozgu Decl. Ex. F (Office of Special Investigations Corporal Punishment Intake Form, Feb. 7, 2008); Ozgu Decl. Ex. K at D 00002-03 (Mem. report of Chancellor's Office of Special Investigations). The class consisted of about 30 high-performing students. Pl. Supp. Aff. ¶ 12; Hr'g Tr. 24. It was fairly evenly divided between males and females. Pl. Supp. Aff. ¶ 12; Hr'g Tr. 25. The group reflected the school's general student population, which is economically, racially, and ethnically diverse, but is predominantly white with a significant number of recent immigrants. Pl. Supp. Aff. ¶¶ 11-12. All members of the class were native or fluent English speakers. Hr'g Tr. 25. Parents had been informed in a letter from the school's principal of the state HIV/AIDS education requirement, and had been assured by the principal that the instruction would be presented in an "age appropriate" fashion. *See* Ozgu Decl. Ex. E (Dec. 2007 letter from principal to parents).

Plaintiff taught from a grade 8 lesson plan in the Board-issued HIV/AIDS Curriculum entitled "How is HIV transmitted?" *See* Ozgu Decl. Ex. D at D 00432-37 (pp. 128-33) (Board's HIV/AIDS Curriculum, Grade 8, Lesson 2); Hr'g Tr. 25. The lesson plan starts with a list of "performance objectives," including enabling students to "[i]dentify which body fluids can

transmit HIV from an infected person to an uninfected person," and "[i]dentify activities and behaviors through which HIV can be transmitted." *Id.* at D 00432 (p. 128).

The bulk of the lesson plan consists of information about HIV transmission, including: definitions of relevant terms like "epidemic," "transmission," "preseminal fluid," and "vaginal fluid"; information about HIV concentrations found in different bodily fluids; descriptions of sexual behaviors that may result in HIV transmission, such as oral, vaginal, and anal intercourse; discussion of other avenues of HIV transmission; advice on how to reduce the risk of HIV transmission; and related information. The lesson plan presents the information in a question-answer format, apparently designed to model a dialogue between teacher and student. Among the suggested questions to be posed by teachers are "Which body fluids from an infected person may contain HIV?", "What are some behaviors that can increase one's risk of getting HIV?", and follow-up questions. *Id.* at D 00433-34 (pp. 129-30). The teacher is directed to say, "Let's be sure we all know the meaning of these terms," and to define the terms for relevant body fluids. *Id.* at D 00433 (p. 129). Other than the question-answer dialogues, the lesson plan does not provide or suggest any presentations, formats, methods of organization, exercises, activities, group work, in-class assignments, or other methods or techniques for engaging students or conveying the information. No limitations on the terminology to be used are indicated.

Interspersed among the suggested question-answer exchanges in the lesson plan are "Teacher Notes" that anticipate student questions and issues and provide additional information to the teacher for responding to those issues. One Note in the lesson plan addresses vocabulary concerns; it strongly suggests that nonstandard vocabulary that is understood by the students, such as slang, may be used to assist students in understanding the concepts covered:

> *Many students use other terms to describe these body fluids and other matters related to sexuality.* As with all HIV/AIDS

– 7 –

> education, it is important that students understand the terms used in the classroom, use them correctly, and relate them to their own experience and language. *If students use different terms* to refer to body fluids, *make sure they understand the relationship between both sets of terms.*
>
> If students seem uncomfortable during discussion of body fluids and HIV transmission, acknowledge that such a response is natural. Because we do not often discuss such matters in public, it is understandable that *some people may feel embarrassed. Nevertheless, it is important to know the facts.*

Ozgu Decl. Ex. D at D 00433 (p. 129) (emphases added). The introductory materials to the HIV/AIDS Curriculum contain a comment on "Sensitive and Personal Issues," which addresses similar points:

> HIV/AIDS education deals with issues of interpersonal relationships, sex, drugs, and death. The teacher's capacity to listen perceptively and empathetically and to demonstrate a comfortable attitude in dealing with students' beliefs and feelings associated with HIV/AIDS is crucial to the curriculum's successful implementation. . . . [S]tudents come from many different backgrounds and traditions, and . . . many may have difficulty sharing ideas and discussing these issues.

*Id.* at D 00405-06 (pp. xvii-xviii).

The Curriculum's Introduction emphasizes the importance of educating students even though the topic is a sensitive one:

> HIV/AIDS education may mean introducing certain topics earlier than some adults would like. We may remember our own childhood years as sheltered and may prefer not to discuss such topics as drug use, sex, sexual intercourse, and condoms in intermediate and junior high school. Yet we cannot help students protect themselves against HIV unless we tell them how HIV is transmitted.

*Id.* at D 00399 (p. xi).

The introductory materials stress that teachers must "[b]e prepared to answer questions about sex." *Id.* at D 00406 (p. xviii). A Teacher Note in the "How is HIV transmitted?" lesson

– 8 –

plan specifically "recommends that in Grades 7 and 8, *teachers should mention types of sexual intercourse* in response to students' questions." *Id.* at D 00434 (p. 130) (emphasis added).

The HIV/AIDS Curriculum contains supplemental materials in a section entitled "Optional Vocabulary and Concept-Building Strategies for Secondary Grades." *See* New York City Dep't of Education's HIV/AIDS Curriculum at 301-12, *available at* http://schools.nyc.gov/offices/teachlearn/documents/docs/hivaidsdocs/HIVAidsSecLevelOptVoc ab.pdf. Among the recommended exercises for vocabulary and concept building are two based upon "semantic associations" and "brainstorming." The first, "Connecting Concepts to Vocabulary: Semantic Associations," directs teachers to "[s]elect a word or words related to HIV/AIDS issues," write the word on the chalkboard, "*[a]sk . . . the students to write as many things as they can think of that are related to*" the chosen word, and then write the students' lists on the blackboard and discuss new words. *Id.* at 309 (emphasis added). The second, "Expanding Vocabulary Through Brainstorming: Semantic Mapping with HIV/AIDS Focus Words," recommends that teachers "[s]elect an 'HIV/AIDS focus word:' a word pertaining to a key HIV/AIDS concept that you would like students to think about," write the word on the chalkboard, "*[h]ave students list on paper as many words as possible that are related to the focus word,*" write the students' words "*on the chalkboard, grouping them into categories,*" and "[u]se any disagreement about defining or categorizing words to spark discussion." *Id.* at 310 (emphases added).

Teachers are invested with full discretion to design the format and organization of their lessons within the boundaries established by mandated lesson-plans under the Collective Bargaining Agreement between the teachers' union and the Board (the "Contract"):

**Lesson Plan Format**

*The development of lesson plans* by and for the use of the teacher is a professional responsibility vital to effective teaching. The organization, format, notation and other physical aspects of the lesson plan are appropriately *within the discretion of each teacher. A principal* or supervisor *may suggest, but not require, a particular format or organization*, except as part of a program to improve deficiencies of teachers who receive U-ratings or formal warnings.

Ozgu Decl. Ex. M at D 00514 (p. 47) (emphases added).

During the lesson Ms. Kramer asked the students to provide words that they had heard or used when speaking about sexual acts, body parts, or bodily fluids. *See* Ozgu Decl. Ex. K at D 00003-04 (Mem. report of Chancellor's Office of Special Investigations); Pl. Mem. at 3. The words students suggested included sexual terms ranging from euphemisms to widely used American vulgarisms. *See generally* App'x A, *infra* (Glossary of Relevant Sexual Terms, providing definitions of representative terms at issue); App'x B, *infra* (pages from student notes recording sexual terms mentioned in the lesson); *see also, e.g., Fox Indus., Inc. v. Gurovich*, 323 F. Supp. 2d 376, 381-82 nn.9-11 (E.D.N.Y. 2004) (defining similar vulgar terms).

Plaintiff wrote words offered by the students on the blackboard. *See* Ozgu Decl. Ex. K at D 00003-04. Where applicable, she associated each word with its more socially acceptable equivalent, such as "breast," "penis," and "vagina." *See* App'x B, *infra.*

Ms. Kramer testified that the methods she used were consistent with the sex education training she had received provided by the school system. She had used the same method in sex education classes for the previous fifteen years, eliciting similar language from students:

| | |
|---|---|
| THE COURT: | Have you ever received training in sex or HIV education? |
| MS. KRAMER: | Yes, I have. |
| THE COURT: | Where? |

| | |
|---|---|
| MS. KRAMER: | Brooklyn District 15. |
| THE COURT: | What kind of training was that? |
| MS. KRAMER: | That was the HIV/AIDS training. We had to meet on staff development days, how to receive curriculum [sic] and teach. Previous to that there used to be a curriculum called Family living and Sex Ed. So one kind of turned into the other. |
| THE COURT: | Was what you did in this classroom consistent with that training? |
| MS. KRAMER: | Yes. |
| THE COURT: | How many years have you been using the technique that was complained of in this incident? |
| MS. KRAMER: | Approximately 15. |
| THE COURT: | The same words and everything? |
| MS. KRAMER: | Whatever words the students used, that's what I would address. |
| THE COURT: | So it is essentially the same with respect to slang? |
| MS. KRAMER: | Basically what we would call vulgar terms, not my terms, their terms. |

Hr'g Tr. at 23-24.

Relied on by her in designing and implementing this lesson plan was the "Teacher Note" in the Board's HIV/AIDS Curriculum concerning student vocabulary and familiarity with terms.

| | |
|---|---|
| MS. KRAMER: | [A]ccording to the curriculum—if I may? |
| THE COURT: | Yes. Page? |
| MS. KRAMER: | Page 129. It says: ["]As with all HIV/AIDS education, it is important that students understand the terms used in the classroom, use them correctly, and relate them to their own experience and language. If students |

– 11 –

use different terms to refer to body fluids, make sure they understand the relationship between both sets of terms.["]

Throughout the curriculum, it states other things about addressing the students' language. So the students would speak in terms that other students and myself didn't necessarily understand or have ever heard before, and then other students would say, well, what is that and what do you mean. That's how the entire lesson came about with this particular class.

I specifically told them that it was a brainstorming session, they did not have to say anything or acknowledge anything they were uncomfortable with. And if a student asked if they need to copy this in their notes, I told them absolutely not, we are just brainstorming.

*Id.* 32-34 (quoting Board's HIV/AIDS Curriculum, Ozgu Decl. Ex. D at D 00433 (p.129)); *see also* Ozgu Decl. Ex. K at D 00004 (Mem. report of Chancellor's Office of Special Investigations) ("Ms. Kramer stated that, in her teaching guide, it suggests that she use terminology that the students may be familiar with, and to make sure they understand the relationship between the proper terms and improper terms[.]").

The next day Ms. Kramer was summoned to the assistant principal's office where she was informed that some parents had complained about the lesson. *See* Pl.'s Aff. in Opp'n to Mot. for Summ. J. Ex. 4 at 26 (plaintiff's deposition) ("Pl. Dep."). She was then called to the principal's office with her union representative. *Id.* at 29-30. There she was shown a few students' notebooks and asked to explain her lesson. *Id.* at 30. The principal subsequently requested the Board's Office of Special Investigations ("OSI") to investigate. *See* Def.'s Local Rule 56.1 Statement of Undisputed Material Facts ("Def. SUF") ¶ 13; Ozgu Decl. Ex. F (OSI Corporal Punishment Intake Form, submitted by the principal on Feb. 7, 2008).

– 12 –

The school system's Division of Human Resources informed Ms. Kramer by letter of February 8, 2008 that she was reassigned to non-classroom duties pending investigation of allegations of improper "*corporal punishment*." Ozgu Decl. Ex. I (emphasis added). The letter stated:

> We have been informed that the following allegation(s) have been made against you on February 7, 2008:
>
> • *Corporal Punishment*
>
> In view of the seriousness of the allegation(s), effective February 8, 2008, we are reassigning you from your position as a [classroom teacher.]

*Id.* (emphasis added). New York City schools' Chancellor's Regulation A-420, entitled "Pupil Behavior and Discipline – Corporal Punishment," prohibits "any act of physical force upon a pupil for the purpose of punishing that pupil." Chancellor's Reg. A-420 §§ II-III.

The Contract appears to invest administrators with authority to remove a teacher from the classroom pending the outcome of an OSI investigation into possible disciplinary charges. Ozgu Decl. Ex. M at D 00582 (p. 115). Disciplinary charges and proceedings against tenured city school teachers are governed by section 3020-a of the New York Education Law, entitled "Disciplinary Procedures and Penalties." Section G of Article 21 of the Contract, entitled "Education Law 3020-a Procedures," provides supplemental procedures to those laid out in section 3020-a. *See* Ozgu Decl., Ex. D at D 00580 (p. 113) ("Tenured teachers facing disciplinary charges . . . will be subject to Section 3020-a of the Education Law as modified by paragraphs 1-10 below."). Paragraph 4 of section G, under the heading "Investigations," provides:

> Where the Board conducts an investigation of an employee *and the employee has been reassigned to administrative duties pending the outcome of such investigation* . . . the employee will be restored to

– 13 –

> service no later than 6 months from the date of his or her removal
> unless Education Law § 3020-a charges have been preferred
> against the employee. . . . This requirement to restore an employee
> to service after 6 months does not include investigations conducted
> by the Special Commissioner of Investigation . . . .

*Id.* at D 00582 (p. 115) (emphasis added).

Plaintiff was excluded from the classroom through the end of the school year. She received full pay while on reassignment. Pl. Dep. 48-49.

The February 8 communication removing Ms. Kramer from classroom duties declared that her "services in per session activities are suspended as a result of this reassignment." Ozgu Decl. Ex. I. Per session activities are assignments outside of normal school hours under the Contract. Teachers perform them for extra pay; they include coaching sports teams and grading state-wide assessment exams. *See* Pl. Mem. at 4; Ozgu Decl. Ex. M at D 00553-56 (pp. 86-89).

In the past Ms. Kramer had regularly received per session assignments, and had never been denied an assignment for which she applied. *See* Pl. Dep. 55, 64 (testimony that plaintiff had applied for per session work "at least five times" in the past and had never been denied); *see also* Ozgu Decl. Ex. T (plaintiff's 2008 application for New York State English Language Arts ("ELA") exam scoring per session activity, stating "I have been scoring the ELA for the past few years"). Upon her reassignment, Ms. Kramer was suspended from one ongoing per session assignment. *See* Pl. Dep. 55-58. She was unable to commence another assignment that she had previously applied for, but did not receive notice that she had been awarded until after her suspension. *See* Pl. Supp. Aff. Ex. 1 at 3-5 (emails of Mar. 5 & 11, 2008 informing plaintiff she was selected for mathematics test scoring assignment; email of Mar. 6, 2008 confirming that notwithstanding initial selection, plaintiff was prohibited from working on any per session assignment).

– 14 –

An OSI investigator interviewed school officials and students; Ms. Kramer was questioned in the presence of her union representative. Ozgu Decl. Ex. K at D 00002-04 (investigator's report). The April 24, 2008 report of the investigation concluded that "[t]he allegation that Ms. Kramer wrote sexually explicit terms on the board in front of her students is substantiated." *Id.* at D 00004.

In June, plaintiff received a 2007-2008 yearly performance rating of "N," sometimes also referred to as an "NA" rating. Ozgu Decl. Ex. N (plaintiff's 2007-2008 annual performance review). "NA" denotes a rating of "not applicable," rather than an "S" for satisfactory or a "U" for unsatisfactory; it is "used only in situations where a pedagogical employee is reassigned out of his/her regular assignment *for disciplinary reasons*." Ozgu Decl. Ex. M at D 00579 (p. 112) (Contract's definition of "NA" rating; emphasis added). An "NA" rating "cannot be used in any proceeding as evidence of wrongdoing and will not otherwise affect any other rights afforded in the [Contract] where ratings are an issue." *Id.* In previous years Ms. Kramer had received only "S" ratings. Pl. Supp. Aff. ¶ 9; Hr'g Tr. 24.

The investigator's report was forwarded to the principal. Ozgu Decl. Ex. L (Apr. 24, 2008 memorandum from director of OSI to principal). A meeting among the principal, plaintiff, and her union representative took place on August 28, 2008. Ozgu Decl. Ex. O (Aug. 26, 2008 letter from principal to plaintiff scheduling meeting); *id.* Ex. P (Sept. 29, 2008 letter from principal to plaintiff summarizing meeting). In a September 29, 2008 letter to Ms. Kramer, the principal stated his conclusion that Ms. Kramer had "requested that students provide . . . slang words for male and female genitalia, sexual acts and bodily fluids," had written them on the blackboard, and had directed students to write the terms in their notebooks. Ozgu Decl. Ex. P at D 00634.

– 15 –

The September 29 letter concluded that Ms. Kramer's actions had "caused students to experience mental distress," thereby violating Chancellor's Regulation A-421 prohibiting "verbal abuse." *Id.* Regulation A-421 provides in relevant part:

A-421       PUPIL BEHAVIOR AND DISCIPLINE – VERBAL ABUSE

### ABSTRACT

This regulation defines and prohibits the use of verbal abuse upon a student. . . .

### I.     INTRODUCTION

Verbal abuse of students is prohibited.  Disruptive behavior by a student must never be punished by use of verbal abuse.  Such behavior usually reflects underlying problems that require guidance intervention.  School personnel should take steps to identify the problem(s) and, working closely with parents, help the student receive maximum benefit from the educational program offered at the school.  Matters concerning student behavior should be addressed in accordance with Chancellor's Regulation A-443 and the Disciplinary Code.

### II.    DEFINITIONS

Verbal abuse is not corporal punishment, but is separately proscribed by this regulation.  Prohibited verbal abuse includes:
- *language that tends to cause fear or physical or mental distress;*
- discriminatory language based on race, color, national origin, alienage/citizenship status, ethnicity, religion, gender, disability, or sexual orientation which tends to cause fear or physical or mental distress;
- language that tends to threaten physical harm; or
- language that tends to belittle or subject students to ridicule.

### III.   PROHIBITION

A. Verbal abuse of students is prohibited in and around school premises, as well as on school trips.
B. No verbal abuse shall be inflicted in any of the public schools, nor punishment of any kind tending to cause

– 16 –

excessive fear or physical or mental distress.   Violation
shall constitute grounds for dismissal.

Ozgu Decl. Ex. Q at D 00636 (p. 1 of 5) (emphasis added).

It is conceded by the Board that there is "no explicit language in the [principal's

December 2007 letter to parents] or in the teaching curriculum that says that these particular

words [used in Ms. Kramer's lesson] are prohibited." Hr'g Tr. 8.  No school policy or regulation

specifically prohibits the use of this language in the classroom.

Included in the principal's September 29 letter was a warning: "This incident may lead

to further disciplinary action, including an unsatisfactory rating and charges that can lead to your

termination." Ozgu Decl. Ex. P at D 00634.  It appears that no formal disciplinary charges were

ever brought under Regulation A-421. *See* Reply Mem. of Law in Further Supp. of Def.'s Mot.

for Summ. J. ("Def. Reply Mem.") at 3 n.2.  Nevertheless, the principal's adverse letter is part of

plaintiff's permanent personnel file. Hr'g Tr. 26.

Plaintiff disputed the principal's finding that she directed students to write terms in their

notebooks. *See* Ozgu Decl. Ex. R (plaintiff's objection to principal's findings).  She did not

otherwise contest the factual findings adopted in the principal's September 29 letter.  The

principal's letter noted that Ms. Kramer had explained that she intended "to simplify the lesson

plan," and "felt that by allowing students to participate in the lesson using slang terminology it

would eliminate the students' curiosity of the terms in the future." Ozgu Decl. Ex. P at D 00634.

On Oct. 14, 2008, eight months after the event, Ms. Kramer was restored to classroom

teaching. Ozgu Decl. Ex. S (Oct. 10, 2008 letter from Division of Human Resources to

plaintiff).  She applied for and was denied three per session assignments during the 2008-2009

school year, including an assignment scoring the New York State English Language Arts

("ELA") exam. *See* Pl. Dep. 58-59.  This was work she claims would have been given to her

– 17 –

were it not for the "NA" rating she received as a result of her reassignment out of the classroom. *See* Pl. Dep. 59-64; Ozgu Decl. Ex. V (decision regarding plaintiff's grievance of denial of ELA scoring assignment).

Under the Contract, per session activities are generally awarded "in order of seniority," subject to specific qualifications that may be required for particular activities. Ozgu Decl. Ex. M at D 00558 (p. 91). Ms. Kramer, with twenty-six years of experience, is among the most senior teachers at her school. Hr'g Tr. 26. Retention rights in per session activities are obtained by "[t]eachers with at least two years of continuous satisfactory service in a particular activity." Ozgu Decl. Ex. M at D 00557 (p. 90). Ms. Kramer asserts retention rights in the ELA exam scoring, based on several prior years of participation in that activity. *See* Hr'g Tr. 25; *see also* Ozgu Decl. Ex. T (plaintiff's 2008 application for ELA exam scoring per session activity, stating "I have been scoring the ELA for the past few years"). No basis for retention rights in other per session activities is apparent in the record.

The Per Session Vacancy Notice for the ELA exam scoring assignment that Ms. Kramer unsuccessfully applied for noted that a "[s]atisfactory rating [was] required." Ozgu Decl. Ex. U (Per Session Vacancy Notice No. 72, posted Dec. 8, 2008). Plaintiff concedes that her application for another per session assignment was submitted late, but it is unclear if that was the reason the application was denied. *See* Pl. Dep. at 58-59, 62.

The Contract contains detailed grievance and arbitration procedures governing complaints by teachers of "a violation, misinterpretation or inequitable application of any of the provisions of the" Contract. Ozgu Decl. Ex. M at D 00589 (p. 122) (Contract, Art. 22, "Grievance Procedure"). Ms. Kramer initiated a grievance concerning the denial of ELA exam scoring in the 2008-2009 school year. *See* Ozgu Decl. Ex. V (Grievance Decision – Step 1, Mar.

– 18 –

20, 2009). A "Step 1" conference on the grievance attended by Ms. Kramer, a union representative, and a Chancellor's Representative was held on March 4, 2009. *Id.* The Chancellor's Representative issued a Step 1 grievance decision on March 20, 2009, concluding that the assignment had properly been denied based on Ms. Kramer's lack of an "S" rating for the previous year. *Id.* This conclusion was affirmed after an April 8, 2009 "Step 2" grievance conference. *See Ozgu Decl. Ex. W (Grievance Decision, May 5, 2009).* Plaintiff contested the outcome of the grievance hearings, and the dispute has been submitted to arbitration, pursuant to the Contract. *See* Hr'g Tr. 16-17; Contract Art. 22.C ("Arbitration"). No other grievance relating to the February 2008 suspension or its consequences has been made by Ms. Kramer.

Ms. Kramer received an "S" rating for her performance in the 2008-2009 academic year. *See* Def. SUF ¶ 42; Hr'g Tr. 24. She continues to teach HIV/AIDS and sex education lessons, and continues to use the methods of instruction that were the subject of parent complaints in February 2008. No school official has directed her to stop using these methods:

| | |
|---|---|
| THE COURT: | [A]re you now teaching 13- and 14-year-olds? |
| MS. KRAMER: | Yes, I am. |
| THE COURT: | Using the same technique? |
| MS. KRAMER: | Similar technique. |
| THE COURT: | And the slang and vulgar words used in class? |
| MS. KRAMER: | By the children, yes, they are. |
| | . . . |
| THE COURT: | Were you ever explicitly told not to use this kind of thing in the future? |
| MS. KRAMER: | No, I never was. |
| | . . . |

| THE COURT: | But you are still using—when the students use that language, that happens in these classes? |
| MS. KRAMER: | It is happening this year. I felt extremely uncomfortable with it because I'm afraid, honestly. |
| THE COURT: | Well, did you ever get a specific communication or did the principal ever call you in and say, don't allow these terms to be used? |
| MS. KRAMER: | Never, not until I was called in after the complaint, but never before that. |
| THE COURT: | Since then? |
| MS. KRAMER: | No. |

Hr'g Tr. 28-29, 32-33.

Ms. Kramer recently received a satisfactory rating for a sex education lesson she taught to seventh graders. *See* Teacher Observation Report, May 3, 2010 (Court's Ex. 1 of May 6, 2010). In that lesson, she used a technique similar to that used in the lesson that is the subject of this case; students were asked to write down terms they knew on large sheets of paper. *See* Hr'g Tr. 27-28.

Plaintiff claims that her extended suspension from classroom duties, and the "NA" rating she received, humiliated her and caused her to lose respect in the eyes of her colleagues and supervisors, and that the incident continues to affect her professional standing and reputation. *See* Pl. Aff. in Opp'n to Mot. for Summ. J. ¶¶ 7-8; Hr'g Tr. 26.

## III.   Law

### A.   Summary Judgment

Summary judgment is appropriate only if "there is no genuine issue as to any material fact and if the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see also Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 5 (2d Cir. 1999). Dismissal of the complaint is warranted when there is no genuine issue as to any material fact after construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor. Fed. R. Civ. P. 56(c); *see Anderson*, 477 U.S. at 247-50, 255; *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009).

The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If the moving party appears to meet this burden, the opposing party must produce evidence that raises a material question of fact to defeat the motion. *See* Fed. R. Civ. P. 56(e). This evidence may not consist of "mere conclusory allegations, speculation or conjecture." *Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996); *see also Delaware & Hudson Ry. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) ("Conclusory allegations will not suffice to create a genuine issue.").

### B.     First Amendment

The First Amendment is applicable to the states through the Fourteenth Amendment. It prohibits a state from abridging freedom of expression. *See, e.g., Gitlow v. New York*, 268 U.S. 652, 666 (1925). Neither "students [n]or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). The Supreme Court has never removed instructional speech "from its presumptive place within the ambit of the First Amendment." *Evans-Marshall v. Bd. of Ed. of Tipp City Exempted Vill. Sch. Dist.*, 428 F.3d 223, 229 (6th Cir. 2005). Neither has the Court ever "held that the First Amendment applies to a teacher's classroom speech." *Id.*; *see also id.* at 235 (Sutton, J., concurring).

Teacher speech cases must be viewed against a backdrop of the Supreme Court's robust protection of academic freedom. *See, e.g., Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967) ("[Academic] freedom is . . . a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom."). Significant, however, is "the Supreme Court's tradition of deferring to local school boards with regard to educational matters." *Evans-Marshall*, 428 F.3d at 237 (citing *inter alia: Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267 (1988); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 42 (1973); *Sweezy v. New Hampshire*, 354 U.S. 234, 255 (1957)); *see also Lee v. York County Sch. Div.*, 484 F.3d 687, 695 (4th Cir. 2007), *cert. denied*, 552 U.S. 950 (2007) (affirming public schools' wide discretion "to regulate speech that occurs within a compulsory classroom setting"); Alexander Wohl, *Oiling the Schoolhouse Gate: After Forty Years of* Tinkering *With Teachers' First Amendment Rights, Time for a New Beginning*, 58 Am. U.L. Rev. 1285, 1289 (2009).

Age-appropriateness of speech for a student audience has been recognized as a relevant factor: "There can be little doubt that speech appropriate for eighteen-year-old high school students is not necessarily acceptable for seven-year-old grammar school students. Human sexuality provides the most obvious example of age-sensitive matter[.]" *Walker-Serrano ex rel. Walker v. Leonard*, 325 F.3d 412, 416-17 (3d Cir. 2003).

Divergence among courts with regard to the scope and content of teachers' free speech rights in the classroom has been reflected in case law, scholarly literature, and the legal press. *See, e.g., Evans-Marshall*, 428 F.3d at 236-37 (Sutton, J., concurring); Wohl, *supra*, at 1289-90 ("When it comes to the specific role of teachers in classrooms, however, courts have shied away from establishing an individual standard."); Karen C. Daly, *Balancing Act: Teachers' Classroom Speech and the First Amendment*, 30 J.L. & Educ. 1, 1 (2001) ("In the absence of any Supreme

– 22 –

Court precedent squarely addressing the scope of public school teachers' free speech rights in the

classroom, lower federal courts and state courts have been forced to rely on the [inadequate]

precedents established in either *Pickering v. Board of Education*[, 391 U.S. 563 (1968)] or

*Hazelwood School District v. Kuhlmeier*.").

### 1.   Official Speech of Public Employees

In general, public employees' speech "pursuant to their official duties" falls outside of the

First Amendment's protections. *See Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). The

Supreme Court's *Garcetti* decision, which confirmed this rule, specifically left open its

application to "speech related to scholarship or teaching." *See id.* at 421, 425.

Cases decided prior to *Garcetti* had held out the possibility of First Amendment

protection for public employee speech that involved matters of public concern, where the right to

free speech was not outweighed by the public employer's interest in regulating the speech. *See*

*Connick v. Myers*, 461 U.S. 138, 142 (1984); *Pickering*, 391 U.S. at 568; *see also Garcetti*, 547

U.S. at 418. *Garcetti* eliminated hope for First Amendment protection in work-related matters

for speech by most public employees. But the possibility remains that teachers' official speech

on matters of public concern may qualify for protection in some circumstances. *See id.* at 417-

20, 425.

### 2.   Student Speech

Students' free speech rights are limited "in light of the special characteristics of the

school environment." *Tinker*, 393 U.S. at 506. Schools may regulate student speech in three

circumstances: when the speech is (1) school-sponsored, (2) "offensively lewd and indecent," or

(3) likely to cause substantial and material disruption of school activities. *See Hazelwood*, 484

U.S. at 273 (determining that schools may regulate "school-sponsored" speech "so long as their

actions are reasonably related to legitimate pedagogical concerns"); *Bethel Sch. Dist. No. 403 v.*

*Fraser*, 478 U.S. 675, 685 (1986) (recognizing broad school authority to restrict "offensively lewd and indecent speech"); *Tinker*, 393 U.S. at 506-07, 514 (holding that student speech may be restricted if it causes "substantial disruption of or material interference with school activities").

For purposes of the instant case, only the first two categories of speech that may constitutionally be subject to regulation—school-sponsored speech, and lewd and indecent speech—are relevant.  It is not suggested that the speech in question caused disruption of school activities.

School-sponsored speech includes words or their equivalent that "might reasonably [be] perceive[d] to bear the imprimatur of the school." *Silano v. Sag Harbor Union Free Sch. Dist. Bd. of Ed.*, 42 F.3d 719, 723 (2d Cir. 1994) (quoting *Hazelwood*, 484 U.S. at 271).  Restrictions on such school-sponsored verbalizations comport with the First Amendment if they are reasonably related to legitimate teaching considerations. *Id.*  Whether a school's speech restriction is "reasonably related to a legitimate pedagogical concern 'will depend on, among other things, the age and sophistication of the students, the relationship between teaching method and valid educational objective, and the context and manner of the presentation.'" *Id.* (quoting *Ward v. Hickey*, 996 F.2d 448, 453 (1st Cir. 1993)).

"The makeup of the curriculum . . . is by definition a legitimate pedagogical concern." *Boring v. Buncombe County Bd. of Ed.*, 136 F.3d 364, 370 (4th Cir. 1998) (en banc).  In particular, a recognized concern is a school's interest in accounting for "the emotional maturity of the intended audience in determining whether to disseminate student speech on potentially sensitive topics" such as "the particulars of teenage sexual activity." *Hazelwood*, 484 U.S. at 272.

Lewd, indecent, or vulgar speech by students is subject to broad restrictions and regulations by schools. *See Fraser*, 478 U.S. at 684-86. This authority is based in part on the state's greater ability to restrict the availability of sexually explicit material with respect to children than with respect to adults. *See id.*; *see also F.C.C. v. Pacifica Found.*, 438 U.S. 726, 749-50 (1978).

### 3.   Teachers' Classroom Speech

There is disagreement among the federal courts of appeals on a critical issue: Should teacher classroom speech be analyzed as the official speech of the teacher as a public employee, or under the more protective standard applicable to student speech? The Court of Appeals for the Second Circuit is among the courts that have extended the Supreme Court's standard for student speech to teachers' instructional speech. *See, e.g., Silano*, 42 F.3d at 722-23; *see also Evans-Marshall*, 428 F.3d at 236 (Sutton, J., concurring) (citing as examples of this approach: *Ward v. Hickey*, 996 F.2d 448, 453 (1st Cir. 1993); *Silano*, 42 F.3d at 724; *Webster v. New Lenox Sch. Dist. No. 122*, 917 F.2d 1004, 1008 (7th Cir. 1990); *Lacks v. Ferguson Reorganized Sch. Dist. R-2*, 147 F.3d 718, 719 (8th Cir. 1998); *Miles v. Denver Pub. Sch.*, 944 F.2d 773 (10th Cir. 1991); *Bishop v. Aronov*, 926 F.2d 1066, 1074 (11th Cir. 1991)). *But see, e.g., Weintraub v. Bd. of Ed.*, 593 F.3d 196 (2d Cir. 2010) (determining that a grievance filed by a teacher was unprotected speech made pursuant to an official duty, without considering the relevance of his position as an educator).

Other federal appellate courts analyzing teacher speech have applied the Supreme Court's more restrictive standard for analyzing official speech of public employees. The Courts of Appeals for the Third, Fourth, and Fifth Circuits have determined that teacher instructional speech is not entitled to First Amendment protection because teachers do not speak on matters of public concern when they follow a school-mandated curriculum. *See Edwards v. Calif. Univ. of*

*Penn.*, 156 F.3d 488, 491 (3d Cir. 1998) (concluding "that a public university professor does not have a First Amendment right to decide what will be taught in the classroom"); *Boring v. Buncombe County Bd. of Ed.*, 136 F.3d 364, 368 (4th Cir. 1998) (en banc) (limiting *Hazelwood* standard to cases of student speech); *Kirkland v. Northside Indep. Sch. Dist.*, 890 F.2d 794, 798 (5th Cir. 1989), *cert. denied*, 496 U.S. 926 (1990) (holding teacher speech attains "protected status if the words or conduct are conveyed by the teacher in his *role as citizen* and not in his *role as an employee* of the school district" (original emphases)).

The Court of Appeals for the Sixth Circuit, in a pre-*Garcetti* decision, applied the public employee test to teacher curricular expression, *see Evans-Marshall*, 428 F.3d at 228-29, but it did not categorically hold that instructional speech was not protected by the First Amendment. Instead, the court looked to the content of the speech to determine if it was protected. *Id.* at 228-31. This view appears to stand alone in focusing on the content of the speech, rather than on whether it was delivered at the school board's direction, to determine if a teacher spoke on a matter of public concern. *Id.* at 236 (Sutton, J., concurring).

Because of the lack of national uniformity, teacher speech in the instant case is analyzed below under both public employee and student speech standards.

### C.   Due Process

The Due Process Clause of the Fourteenth Amendment provides that no "state [shall] deprive any person of life, liberty, or property, without due process of law." The concept of due process encompasses both procedural protections and the notice that is required describing conduct that may result in a deprivation.

#### 1.   Procedural Due Process

"'Due process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria and Rest. Workers Union, Local 473 v.*

*McElroy*, 367 U.S. 886, 895 (1961). "An essential principle of due process is that a deprivation

of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the

nature of the case." *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 542 (1985) (internal

quotation marks omitted); *see also Mathews v. Eldridge*, 424 U.S. 319, 348-49 (1976);

*Ciambriello v. County of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002).

A procedural due process claim requires a determination: "(1) whether [plaintiff]

possessed a liberty or property interest and, if so, (2) what process [s]he was due before [s]he

could be deprived of that interest." *Ciambriello*, 292 at 313.

To establish a property interest in a benefit, a claimant must prove that she possessed

"more than a unilateral expectation . . . [and] [i]nstead, ha[d] a legitimate claim of entitlement to

it." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972); *cf. Abramson v. Pataki*, 278 F.3d 93, 99-

100 (2d Cir. 2002) (quoting *Roth*, 408 U.S. at 577) (stating that a property interest in public

employment may exist if contractual or statutory provisions guarantee continued employment

absent just cause for dismissal). "The Supreme Court has repeatedly recognized the severity of

depriving someone of his or her livelihood" in considering the nature of the process due. *Kuck v.

Danaher*, 600 F.3d 159, 164 (2d Cir. 2010) (quoting *Spinelli v. City of New York*, 579 F.3d 160,

171 (2d Cir. 2009)).

Once a property interest is established, the amount of process constitutionally due is

determined by balancing: (a) the private interest affected by the official action; (b) the risk of an

erroneous deprivation under the procedures used, and the probable value, if any, of additional or

substitute safeguards; and (c) the government's interest, including the function involved and the

burdens of additional or substitute procedures. *Mathews*, 424 U.S. at 335. Because the process

constitutionally due varies in accordance with case-by-case balancing, the concept of due process does not necessarily mandate specific procedures, such as an evidentiary hearing. *Id.* at 348.

### 2.   Notice and Vagueness

The Fourteenth Amendment's guarantee of due process of law ensures that an "individual need not speculate as to the meaning of penal statutes and is entitled to be informed as to what the State commands or forbids." *Thibodeau v. Portuondo*, 486 F.3d 61, 65 (2d Cir. 2007) (quotation marks omitted). This constitutional principle of adequate notice gives rise to the rule of lenity, according to which ambiguities in criminal laws are resolved in favor of the defendant. *See United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 518 (1992). And the vagueness doctrine requires crafting both civil and criminal laws "with sufficient clarity to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited and to provide explicit standards for those who apply them." *Thibodeau*, 486 F.3d at 65 (quotation marks omitted); *see also, e.g., Interstate Circuit, Inc. v. City of Dallas*, 390 U.S. 676 (1968) (invalidating on vagueness grounds civil municipal film licensing ordinance).

A statute or rule that by its terms does not apply to a particular type of conduct fails to provide adequate notice to those engaging in such acts that their conduct is prohibited or subject to penalty. Application of a penal rule to conduct that the rule does not cover is a violation of the constitutional guarantee of adequate notice.

The vagueness doctrine voids on due process grounds a rule that contains "prohibitions [that] are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The need for notice is at the heart of the vagueness doctrine. A punitive enactment is unconstitutionally vague when it (1) does not allow a person of ordinary intelligence a reasonable opportunity to know what is prohibited, or (2) lacks explicit standards, thus permitting arbitrary or discriminatory enforcement. *See Grayned*, 408 U.S. at 108-09; *see also*

– 28 –

*Farid v. Ellen*, 593 F.3d 233, 240 (2d Cir. 2010).  A statute or rule is inadequate under the second criterion when it "fails to provide sufficiently explicit standards for those who apply it," and "impermissibly delegates basic policy matters . . . for resolution on an ad hoc and subjective basis." *Id.* at 243.

Recognized is a teacher's "right to notice of what classroom conduct is prohibited." *Ward v. Hickey*, 996 F.2d 448, 453 (1st Cir. 1993).  "The relevant inquiry is: based on existing regulations, policies, discussions, and other forms of communication between school administration and teachers, was it reasonable for the school to expect the teacher to know that her conduct was prohibited?" *Id.* at 454.  "[A] school is not required to state expressly all types of objectionable conduct in order to place teachers on notice that some conduct is sanctionable." *Marchi v. Bd. of Coop. Educ. Servs. of Albany*, 173 F.3d 469, 480 (2d Cir. 1999).  "[S]chools, acting in their capacity as employers," are granted "significant leeway," but teachers must still have "sufficient notice of what conduct is proscribed" so they can conform their conduct to what is required of them. *Marchi*, 173 F.3d at 480 (citing and adopting the standard of *Ward*, 996 F.2d at 454).

In an illustrative decision, the Court of Appeals for the First Circuit held that a teachers' code of ethics requiring that teachers "recognize[ ] the supreme importance of the pursuit of the truth, devotion to excellence and the nurture of democratic citizenship," was impermissibly vague as applied in a decision to terminate a teacher for "engaging in a discussion of social mores in the use of language with a chalking of a socially taboo word on the blackboard." *Mailloux v. Kiley*, 436 F.2d 565, 566 (1st Cir. 1971); *Mailloux v. Kiley*, 448 F.2d 1242, 1243 (1st Cir. 1971).  It was held that the ethics code provision "cannot justify a post facto decision by the

school authorities that the use of a particular teaching method is ground for discharge, or other serious sanction, simply because some educators disapprove of it." *Id.*

### D.     New York State Law

#### 1.     Breach of Contract

"The elements of a breach of contract claim in New York are: (1) the existence of a contract, (2) performance by the party seeking recovery, (3) non-performance by the other party, and (4) damages attributable to the breach." *RCN Telecom Servs., Inc. v. 202 Centre Street Realty LLC.*, 156 Fed. App'x 349, 350-51 (2d Cir. 2005) (citing *Marks v. New York Univ.*, 61 F. Supp. 2d 81, 88 (S.D.N.Y.1999)).

"Generally, an employee covered by a collective bargaining agreement which provides for a grievance procedure must exhaust administrative remedies prior to seeking judicial remedies." *Spano v. Kings Park Cent. Sch. Dist.*, 61 A.D.3d 666, 670-71 (N.Y. App. Div. 2d Dep't 2009) (citing *Plummer v. Klepak,* 399 N.E.2d 897, 898-99 (N.Y. 1979)).

#### 2.     Negligent Supervision

"In instances where an employer cannot be held vicariously liable for its employee's torts, the employer can still be held liable under theories of negligent hiring, negligent retention, and negligent supervision." *Kenneth R. v. Roman Catholic Diocese of Brooklyn*, 229 A.D.2d 159, 161 (N.Y. App. Div. 2d Dep't 1997). "A necessary element of a cause of action alleging negligent retention or negligent supervision is that the 'employer knew or should have known of the employee's propensity for the conduct which caused the injury.'" *Bumpus v. New York City Transit Auth.*, 47 A.D.3d 653, 654 (N.Y. App. Div. 2d Dep't 2008) (quoting *Kenneth R.*, 229 A.D.2d at 161).

– 30 –

IV.    **Application of Law to Facts**

A.    **First Amendment**

Applying either the the public employee speech standard or the student speech standard, *see* Part III.B.3, *supra*, Ms. Kramer's speech in her state-mandated HIV/AIDS lesson was not protected speech under the First Amendment. Dismissal of her First Amendment claim is warranted.

1.    **Public Employee Speech Standard**

Ms. Kramer concedes that the sexually explicit and slang words were elicited from students in the course of teaching a state-mandated HIV/AIDS lesson. *See* Pl. Mem. at 3; Hr'g Tr. 25; *see also* Ozgu Decl. Ex. D (HIV/AIDS Curriculum). This activity was "pursuant to [her] official duties," *Garcetti*, 547 U.S. at 421.

Teacher instruction is public employee speech. *See, e.g., Boring*, 136 F.3d at 368-70. The words in question did not relate to a matter of public concern and fell outside the protection of the First Amendment. *See Weintraub*, 593 F.3d at 201 ("In *Garcetti*, th[e official duties] inquiry was straightforward because the plaintiff admitted that his speech was part of his official job duties." (citing *Garcetti*, 547 U.S. at 424)).

2.    **Student Speech Standard**

Nor was plaintiff's speech protected by the First Amendment under the more protective standards applicable to student speech. The Board had the authority to regulate or restrict plaintiff's speech based either on its status as "school-sponsored" speech or because it might be construed as lewd, indecent or vulgar.

Since it was uttered as part of a lesson governed by a Board-issued lesson plan, plaintiff's utterances and activities were school-sponsored. *See Hazelwood*, 484 U.S. at 271 (characterizing as "school-sponsored" activities that are "supervised by faculty members and designed to impart

particular knowledge or skills to student[s]"); *Silano*, 42 F.3d at 723 (deeming "school-sponsored" a guest "lecture [that] took place in a traditional classroom setting and was designed to impart particular knowledge to the student participants").

Ms. Kramer's lesson was intended to implement New York State regulations. They mandate HIV/AIDS education, and provide that such instruction must be accurate, age-appropriate and consistent with the community's values. N.Y. Comp. Codes R. & Regs. tit. 8, § 135.3(b)(2). The school board has a legitimate interest in ensuring that teachers devise and implement lesson plans in a way it considers effective and appropriate. *Cf. Boring*, 136 F.3d at 370 (4th Cir. 1998) (en banc) ("The makeup of the curriculum . . . is by definition a legitimate pedagogical concern."). Although the school's decision not to countenance Ms. Kramer's instructional method "reflect[ed] its own restrictive views of the appropriate values to which . . . students should be exposed," that decision was the school's to make. *Virgil v. Sch. Bd. of Columbia County, Fla.*, 862 F.2d 1517, 1520 (11th Cir. 1989); *see also Hazelwood*, 484 U.S. at 267 ("The determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board rather than with the federal courts." (internal quotation marks and citations omitted)).

While terms such as "lewd," "indecent," or "vulgar" are not precise, at least several of the sexually explicit words elicited and written on the board by Ms. Kramer are widely recognized as vulgar and inappropriate in polite social intercourse. *See generally* App'x A & B, *infra*. In the classroom context such forms of expression are subject to broad authority of schools to regulate or restrict. *See Fraser*, 478 U.S. at 684-86. It can be assumed for the purposes of this case that the Board had the power to seek to banish them from the classroom. But this conclusion does not decide the issues of due process and notice.

**B.    Due Process**

    **1.    Procedural Due Process**

Dismissal of Ms. Kramer's general procedural due process claim is appropriate in view of the sustaining of her notice-vagueness claims discussed below. She did suffer a limited deprivation of a constitutionally protected interest in her loss of per session work and other employment-related deprivations. Nevertheless, the procedures utilized by the Board can be found to be adequate under the circumstances.

As a teacher under union contract, plaintiff received her basic pay and benefits while on administrative duty. *See* Pl. Dep. 48-49. Her main source of income was protected. Upon her reassignment, Ms. Kramer was suspended from one ongoing per session assignment. *See* Pl. Dep. 55-58. She was given an "NA" rating for the 2007-2008 school year, resulting in denial during the following year of her application for an ELA exam scoring position. *See* Pl. Dep. 58-59; Ozgu Decl. Ex. V (decision dismissing plaintiff's grievance due to lack of "S" rating). She asserts retention rights under the Contract in the ELA exam scoring work, meaning that she would have been guaranteed acceptance of her application were it not for the "NA" rating. *See* Hr'g Tr. 25. Whether she was deprived of a reasonable expectation of that supplemental income is dealt with under Part IV.B.2, *infra*.

Plaintiff may have possessed "more than a unilateral expectation" with respect to at least these two per session positions; she appears to have had "a legitimate claim of entitlement" to the assignment she was engaged in at the time of her suspension, and the ELA scoring she was denied the next year. *Bd. of Regents v. Roth*, 408 U.S. at 577; *cf. Abramson*, 278 F.3d at 99-100 (quoting *Roth*, 408 U.S. at 577) (stating that a property interest in public employment may exist if contractual or statutory provisions guarantee continued employment absent just cause for dismissal). Ms. Kramer claims that she suffered a deprivation of a constitutionally protected

– 33 –

property right in the denial of collateral per session activities.  Arguably, she was deprived of a significant part of her livelihood through her removal from the classroom, as well as in not being permitted the satisfaction of teaching and the exercise of her professional capacities.  For purposes of this discussion, it is assumed that enforced idleness may constitute a deprivation even if basic pay is not cut off, since it may result in loss of skills and the satisfactions that come from productive activity.

*Piscottano v. Murphy*, 511 F.3d 247, 288 (2d Cir. 2007), finding "no evidence" of constitutional deprivation where plaintiff was placed on administrative leave but "suffered no loss of employment, no demotion, no loss of salary [and] no loss of benefits," is distinguishable. There, the deprivation of work seems to have been shorter, the risk of diminution of skills less, and the charge of possible relationship between a correction officer and suspected criminals more serious than in the instant case.

It can plausibly be argued that Ms. Kramer was granted sufficient process: first, as to her removal from the classroom, the interruption of the ongoing per session work, and the resulting "NA" rating; and, second, as to the denial of the ELA scoring assignment the following year. The "NA" rating and the interruption of per session work resulted automatically from Ms. Kramer's disciplinary reassignment. *See* Ozgu Decl. Ex. I (Feb. 8, 2008 letter from Div. of Human Resources), Ex. M at D 00579 (p. 112) (Contract), Ex. N (plaintiff's 2007-2008 annual performance review).  The process she received in connection with the reassignment could be deemed consistent with the "essential principle" that a deprivation be preceded by notice and an opportunity to be heard. *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. at 542; *see also Mathews*, 424 U.S. at 348-49. Her union representative was present at all meetings that discussed disciplinary action. *See, e.g.*, Pl. Dep. 29-30; Ozgu Decl. Ex. O (Aug. 26, 2008 letter from

principal, requesting plaintiff bring union representative to disciplinary meeting).  And the principal consulted Ms. Kramer before reassigning her, but before any findings considered adverse by him: that plaintiff requested that students provide slang words for male and female genitalia, sexual acts and bodily fluids, and that she directed students to write the words in their notebooks.  Ozgu Decl. Ex. P (Sept. 29, 2009 letter from principal to plaintiff).

Ms. Kramer was afforded what might be treated as constitutionally sufficient process in the denial of the ELA assignment in the 2008-2009 school year.  A procedure existed for contesting denials of per session activities, and plaintiff availed herself of this system by filing a grievance and an appeal.  Ozgu Decl. Exs. V & W ("Step 1" and "Step 2" grievance decisions).  Her administrative complaint appears to have been properly dismissed because an "S" rating was required for the assignment.  See Ozgu Decl. Ex. U (Per Session Vacancy Notice).  Her "NA" rating, the basis for denial of the assignment, was accurate in the sense that plaintiff was in fact on disciplinary reassignment for much of the previous school year.  While the result has the feel of "catch 22" unfairness because she should not have been taken out of the classroom where she would have earned an "S," being reassigned, her "NA" inevitably followed.

For purposes of this opinion it will be assumed that no further procedural safeguards were constitutionally required in connection with denial of the ELA per session assignment.  It is preferable to place the protection of Ms. Kramer's constitutional rights on the lack of required notice in vague and inapt charges, described in the section which immediately follows.  That analysis runs less risk of damaging the present teacher-union-Board procedural disciplinary system.

### 2.    Lack of Notice and Vagueness

Ms. Kramer was reassigned from teaching duties, sent to non-teaching detention, investigated, provisionally determined by her principal to have violated Regulation A-421,

denied a satisfactory rating for the school year, and deprived of the extra income she had

previously been earning from per session assignments. The adverse measures were based

initially on allegations of "corporal punishment," *see* Ozgu Decl. Ex. I (Feb. 8, 2008 letter from

Division of Human Resources regarding reassignment from classroom duties), prohibited by

Chancellor's Regulation A-420. Ultimately, Ms. Kramer's conduct was found by the principal to

have violated Regulation A-421, which prohibits the "verbal abuse of students" through

discipline by use of, among other things, "language that tends to cause . . . mental distress." The

Board has not cited any school policy, rule or guideline charged against the plaintiff that purports

to prohibit or regulate teachers' use in the classroom of words that are vulgar, sexually explicit,

obscene, or otherwise objectionable being used for appropriate instructional purposes rather than

punitively. It is conceded that no school regulation specifically prohibits the use in the

classroom of the language that was elicited in the course of Ms. Kramer's lesson. *See* Hr'g Tr. 8.

　　　For the sanctions imposed to comport with the constitutional guarantee of adequate

notice, the regulations that were the basis for administrators' actions must have informed Ms.

Kramer of the nature of the prohibited conduct. *Thibodeau*, 486 F.3d at 65. In applying the

vagueness doctrine, the regulations are required to "[1] give the person of ordinary intelligence a

reasonable opportunity to know what is prohibited and . . . [2] provide explicit standards for

those who apply them." *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 186 (2d Cir. 2010).

　　　As applied to Ms. Kramer's conduct, Regulations A-420 and A-421 fail the notice

requirement. Regulation A-420, prohibiting corporal punishment, is clearly inapplicable on its

face. It is not, and never has been, contended that plaintiff committed "any act of physical force

upon a pupil." No further analysis of Regulation A-420 is warranted.

Regulation A-421 does not, by its terms, cover the acts committed. Ms. Kramer was trying to help, not to hurt, her students. As applied to her conduct, the regulation fails to satisfy both aspects of the vagueness doctrine—lack of notice and lack of limit on arbitrary enforcement.

Plaintiff's due process claim survives summary judgment due to the lack of constitutionally required notice.

a.   **The Plain Terms of Chancellor's Regulation A-421 and Reasonable Opportunity to Know What Is Prohibited.**

Regulation A-421 by its terms, and in the context of surrounding rules, is addressed to measures taken by teachers to discipline students, not to forms of instruction. It is entitled "Pupil Behavior and Discipline – Verbal Abuse." The introductory section states: "Disruptive behavior by a student must never be punished by use of verbal abuse." Reg. A-421 § I; *see also* Part II, *supra* (quoting relevant portions of Reg. A-421).

Verbal abuse is distinguished from "corporal punishment," the subject of the preceding Chancellor's Regulation A-420. *Id.* § II ("Verbal abuse is not corporal punishment, but is separately proscribed by this regulation."). The Chancellor's Regulations immediately following Regulation A-421 are also concerned with student discipline and related matters. *See* Chancellor's Regs. A-432 ("Search & Seizure"), A-443 ("Student Discipline Procedures").

Prohibited verbal abuse is defined by Regulation A-421 to include "language that tends to cause fear or physical or mental distress," as well as "discriminatory language," "language that tends to threaten physical harm," and "language that tends to belittle or subject students to ridicule." *Id.* § II. Regulation A-421 makes no direct or indirect reference to words that are vulgar, sexually explicit, or obscene; to those used in a non-disciplinary mode; or to those that might be considered objectionable on any grounds not enumerated. There is no indication in the

– 37 –

text of the regulation that it would apply to language that is not addressed to a specific student or students while attempting to correct disruptive behavior.

It is telling that the first reference in the record to Chancellor's Regulation A-421 appears in the principal's September 29, 2008 letter, seven months after the lesson, informing Ms. Kramer of his disciplinary findings. *See* Ozgu Decl. Ex. P at 2. The Division of Human Resources' letter of February 8, 2008 had indicated that her reassignment was due to an investigation of allegations of improper "corporal punishment." Ozgu Decl. Ex. I. This sequence of events suggests that school officials were themselves unaware which school regulation, if any, Ms. Kramer's conduct might have violated. The factual allegations against Ms. Kramer were fully substantiated by the OSI's investigation and were adopted in the principal's letter. That formal Regulation A-421 charges were never brought under Education Law section 3020-a is noteworthy.

Regulation A-421 by its terms does not prohibit use of sexually explicit language in the course of an HIV/AIDS lesson designed to instruct. The language of Regulation A-421 does not provide a "person of ordinary intelligence a reasonable opportunity to know" that use of sexually explicit language in teaching about HIV/AIDS would be subject to discipline. While schools are not "required to state expressly all types of objectionable conduct," and are granted "significant leeway" to use generalized language in rules governing teacher conduct, *see Marchi*, 173 F.3d at 480, the language of Regulation A-421 does not encompass Ms. Kramer's conduct on any reasonable construction, no matter how much leeway is afforded. Plaintiff was not given "sufficient notice of what conduct [was] proscribed." *Marchi*, 173 F.3d at 480.

Based on the text of Regulation A-421, and all other communications between the administration and Ms. Kramer, it was not "reasonable for the school" to have expected Ms.

– 38 –

Kramer "to know that her conduct was prohibited." *Ward*, 996 F.2d at 454; *see also Marchi*, 173 F.3d at 480. Regulation A-421 "cannot justify a post facto decision by the school authorities that the use of a particular teaching method is ground for . . . serious sanction, simply because some educators disapprove of it." *Mailloux*, 448 F.2d at 1243.

### b.    Reasonableness of Plaintiff's Conduct

As already noted, the Board has the authority to forbid the use language it deems objectionable or inappropriate for purposes of instruction. Sound reasons of pedagogy, school discipline, training in polite discourse, or student sensitivity might well support a rule prohibiting slang or obscene terms in the classroom, even when they are being used for appropriate teaching purposes. But the Board has adopted no such rule. *See* Hr'g Tr. 8; Part II, *supra*.

For purposes of the instant case it need not be determined whether teacher conduct that is objectively outrageous or unreasonable may, consistent with constitutional notice requirements, subject the teacher to adverse consequences even in the absence of an explicit rule prohibiting such conduct. Ms. Kramer's methods were not objectively unreasonable. The substantial weight of pedagogical literature and other authorities supports the reasonableness of her approach. She did not go outside what could be considered the educational mainstream in the area of sex and HIV/AIDS education.

Ms. Kramer's understanding of the reasonableness and age-appropriateness of her classroom conduct in the context of an HIV/AIDS lesson is supported by consideration of a number of factors, including: the nature and history of the use of the sexually explicit terms that were elicited; recent public uses of such terms by leaders in politics and the arts that have received wide publicity; the prevalence of such terms in books oriented towards and approved for use by young students; and discussions of the proper use of sexual language in the sexuality and HIV/AIDS education literature, including the Board-issued HIV/AIDS Curriculum from

– 39 –

which Ms. Kramer was teaching.  Analysis of these factors confirms that, in the absence of an express prohibition, Ms. Kramer had no reason to suspect that her conduct would be subject to adverse measures or contrary to any school rule or policy.

### i.   Nature of the Sexually Explicit Terms Used

The terms recorded in two of Ms. Kramer's students' notebooks cover a wide range of different types and registers of sexual terminology in contemporary New York American English.  *See* App'x A & B, *infra*.  It is apparent from the student notebook pages that the discussion led by Ms. Kramer was structured to associate colloquial and nonstandard sexual terms with their standard equivalents.  *See id.*; *cf.* Part IV.B.2.b.iv, *infra* (discussing need to "translate" between clinical terms and colloquial language for students' benefit).  The language offered by the students ran the gamut from euphemistic to vulgar.  *See* App'x A & B, *infra*.

Almost all of the words have well-established meanings that are recognized in standard reference dictionaries such as the *Oxford English Dictionary* (2d ed. 1989), *available with additions and continuous revisions as "OED Online"* at http://dictionary.oed.com/ (the "OED").  *See* App'x A, *infra* (Glossary of Relevant Sexual Terms, providing definitions from OED and other sources).  A small number were too informal or of too recent vintage to have been recognized in standard dictionaries, but were defined in "open" online dictionaries in which definitions of terms are "crowd-sourced," that is, provided by individual internet users acting as amateur lexicographers.  *See* App'x A, *infra* (relying in part on the *Merriam-Webster Open Dictionary* and the *Online Slang Dictionary*).  A few other terms the students offered had no recognized slang meaning in any of the sources consulted by the court.  Several of the terms, including those considered by some to be the most vulgar, are relatively ancient in English common usage.  Other terms entered the language more recently.

Many of the terms noted by Ms. Kramer's students have distinguished literary pedigrees, with appropriate use by recognized twentieth-century literary figures. *See, e.g.*, James Baldwin, *Another Country* 63 (1962); A.S. Byatt, *The Game* 233 (1967); Joseph Heller, *Catch-22*, at 68, 131, 181 (1962); D.H. Lawrence, *Lady Chatterley's Lover* 342 (1928); Norman Mailer, *The Naked and the Dead* 484 (1949); Henry Miller, *Tropic of Cancer* 15 (1935); Philip Roth, *Portnoy's Complaint* 19, 50, 78, 177 (1969); J.D. Salinger, *The Catcher in the Rye* 264 (1951); John Updike, *Couples* 9 (1968); John Updike, *Toward the End of Time* 142 (1997); Tennessee Williams, *Cat on a Hot Tin Roof* 7 (1956); Tom Wolfe, *The Bonfire of the Vanities* 70 (1988); *see generally* OED (providing citations to literary uses of many of the words objected to, from which the preceding citations are drawn).

It is noteworthy that familiarity with and understanding of a wide range of colloquial and vulgar sexual terms may be helpful not only to student understanding of issues concerning sexuality, HIV/AIDS, and related topics, but also for a full appreciation of a significant portion of our literary patrimony. *See also, e.g.,* Albie Sachs, *The Strange Alchemy of Life and Law* 126 (2009) (memoir of justice of Constitutional Court of South Africa, while hospitalized after a bombing of his car for opposing apartheid, ruminating on when it is appropriate to use Latin or vulgar terms in describing male genitalia).

### ii. Publicized Uses of Sexually Explicit Terms

In this epoch of increasingly pervasive mass—and sometimes coarse—communication, sexually explicit terminology of even the most vulgar kind is often found in mainstream media to which adolescents are exposed. The development may rightly be deplored, but it cannot be ignored by dedicated teachers as an element of modern American life of which students could reasonably be expected to be aware.

A series of recent, prominent incidents involving leaders of our Republic illustrate the near impossibility of preventing adolescents from being exposed to explicit slang for sexual terms and concepts. *See, e.g.*, Joseph P. Kahn, *Scenes from a decade of big (bleeping) controversies*, Boston Globe, Mar. 11, 2010, at G17 (describing publicized uses of vulgar words, including by prominent political figures); Room for Debate [blog], *Why Do Educated People Use Bad Words?*, N.Y. Times [Online], Apr. 12, 2010, *at* http://roomfordebate.blogs.nytimes.com/2010/04/12/why-do-educated-people-use-bad-words/ (discussing public use of vulgar terms, including commentary by experts in linguistics and other areas); Richard Adams, *Bleeping . . .* , The Guardian, Mar. 24, 2010, at 23 (reporting public use of vulgarity by two United States Vice Presidents); Cliff Schecter, *The Real . . . : Why Conservatives Don't Trust Him, and Why Independents Shouldn't* 49-50 (2008) (reporting use of vulgarity by a United States Senator); Karen Croft, *The Fix*, Salon.com, Dec. 8, 2003, *available at* http://www.salon.com/entertainment/col/fix/2003/12/08/mon/index.html (reporting use of vulgarity by another United States Senator).  Subsequent coverage and discussion of these incidents in traditional media and on the internet quickly reached many millions of people. *See, e.g.*, CNN, ". . . f-bomb," Mar. 23, 2010, *at* http://www.youtube.com/watch?v=mzgq70kO4Sk.

Explicit slang terms have appeared in the media and popular entertainment. *See, e.g.*, *NBC says sorry for . . . C-word 'slip,'* Times Online, Feb. 15, 2008, *at* http://entertainment.timesonline.co.uk/tol/arts_and_entertainment/tv_and_radio/article3374494.e ce; Anthony Lane, *Street Justice*, The New Yorker, Apr. 26, 2010, at 78 (movie reviews). Discussion of the significance and appropriateness of such language in these contexts has the effect of circulating the terms widely. *See, e.g., id.*; Emma Young, *Don't Be Vulgar, Unless You Are a Man*, Sydney Morning Herald (Australia), Apr. 27, 2010, at 15; Richard Roeper, . . .

– 42 –

*[R]ough, but not the end of civilization; Language . . . may shock, but it's just a movie, not reality*, Chicago Sun-Times, Apr. 19, 2010, at 11; Ty Burr, *Take That!; Crude-humored parody riffs on superheroes, rudely knocking them down to size*, Boston Globe, Apr. 16, 2010, at G6; Posting of David Cox to Guardian Film Blog, ". . . [K]icks the c-word into the mainstream," Apr. 2, 2010, *at* http://www.guardian.co.uk/film/filmblog/2010/apr/02/kick-ass-bad-language.

One recently popularized colloquial term used in Ms. Kramer's lesson, "vajayjay," *see* App'x B, *infra*, (spelled "vaj.j" in students' notebooks), is not yet recognized in standard dictionaries, but was popularized on a primetime network TV show. *See* Stephanie Rosenbloom, *What did you call it?*, N.Y. Times, Oct. 28, 2007, at ST1. The term is apparently not considered vulgar by some. Its swift adoption is said to demonstrate "a vacuum in popular discourse, a need for a word for female genitalia that is not clinical, crude, coy, misogynistic or descriptive of a vagina from a man's point of view." *Id.* It was originally chosen "to mollify standards and practices executives who wanted the script to include fewer mentions of the word vagina." *Id.*

Young people who are not fully protected by a social cocoon will encounter colloquial and vulgar sexual vocabulary in overheard conversation; in movies, videogames, cable and network television shows, and other popular forms of entertainment; via computers or mobile phones on the relatively unregulated and increasingly accessible internet; and in books, including literature designed and approved for young audiences, *see* Part IV.B.2.b.iii, *infra*; and on New York's streets and subways.

Even extremely sheltered adolescents, exposed only to the most sanitized media, cannot completely avoid contact with terms and concepts that are considered by many parents and others to be objectionable. It is not unreasonable for good teachers who want to communicate with their students to expect that adolescents have questions about such vocabulary and concepts.

*See* Part IV.B.2.b.iv, *infra* (discussing studies showing students' curiosity about slang sexual terms).

### iii.     Sexually Explicit Terms in Fiction Assigned in Schools

*The Catcher in the Rye*, referred to *supra*, is notable for its use of a slang sexual term; continuously since its publication it has been one of the most widely assigned novels in American public schools. A review of contemporary fiction and nonfiction written for young readers reveals that many such works employ a much greater range of explicit, and often vulgar, sexual terminology. Many of these books have been approved or recommended by reviewers, experts, or New York State or City education authorities for readers around the age of the eighth-grade students who participated in Ms. Kramer's HIV/AIDS lesson.

Illustrative examples include the novels *Street Pharm* (2006) and *Snitch* (2007), by Allison van Diepen, and the memoir *No Disrespect* (1994), by Sister Souljah. Both van Diepen and Souljah are popular authors of young adult books dealing with themes of urban adolescent life, including sex, violence, and the drug trade. *Street Pharm* was rated for grades eight through eleven by Booklist, and was featured as one the American Library Association's "2007 Quick Picks for Reluctant Young Adult Readers." *See* Frances Bradburn, Review of *Street Pharm*, Booklist, Aug. 1, 2006; Am. Library Assoc., *2007 Quick Picks for Reluctant Young Adult Readers*, *available at* http://www.ala.org/ala/mgrps/divs/yalsa/booklistsawards/quickpicks/07qp.cfm; *cf.* Susan DeGrane, *Librarians Seeking a Good Book Turn to Him*, N.Y. Times, Feb. 24, 1997, at D9 (describing Booklist, a publication of the American Library Association, as "an acquisitions bible for public and school librarians nationwide"). The novel makes frequent use of vulgarity. *See Street Pharm*, 2, 26, 39, 46, 50, 53, 67, 75, 106, 239, *passim*. Similarly, *Snitch* has been described as a "tale for readers 14 and up." *See Over the Transom; Recent books for young*

*readers by Ottawa-area writers*, The Citizen's Weekly: Books, Mar. 30, 2008, at B2. Like

*Street Pharm*, it contains numerous instances of sexually explicit vulgar terms. *See Snitch*, 125,

175, 176, 210, 233, 245, 246, 318, *passim*.

Sister Souljah's *No Disrespect* has been described as "popular in schools country-wide."

*See* Review of *The Coldest Winter Ever* by Sister Souljah, Kirkus Reviews, Feb. 1, 1999. The

language, like that of *Street Pharm* and *Snitch*, is sometimes coarse. *See No Disrespect*, 6, 10,

40, 65, 78, 79, 82, 118, 119, 129, 163, 193, 267, *passim.*

Works of literature that employ one or more of the words that were uttered during Ms.

Kramer's lesson have been approved or recommended for young people by state and city

educational authorities in New York. The New York State Education Department issues an

English Language Arts Resource Guide that lists recommended works of fiction for various age

groups. *See* Univ. of the State of N.Y. & N.Y. State Ed. Dep't, *English Language Arts Resource

Guide: Instructional Materials*, *available at* http://www.emsc.nysed.gov/ciai/ela/pub/elaim.pdf.

Among the titles listed for grades 9-12 are a number that employ terms used by Ms. Kramer's

students, and considered by some to be unacceptably vulgar. These include *The Catcher in the

Rye*, *supra*, at 264, Margaret Atwood's *The Handmaid's Tale* 120 (1986), and John Updike's

*Rabbit, Run* 50, 86 (1960).

A more recent work, Ernesto Quinonez's *Bodega Dreams* (2000), has been used and

recommended by New York City public school officials, as well as educators in other public

schools. It appears on a list of recommended books for grades 9-12 in *Opening the Door to

Learning: Literacy is a Family Affair*, a pamphlet available through the New York City

Department of Education website, with an introductory message written by New York City

schools Chancellor Joel Klein and others. *See* New Visions for Public Schools, *Opening the*

*Door to Learning: Literacy is a Family Affair* 13, *available at*

http://schools.nyc.gov/NR/rdonlyres/BEDE3D48-2839-4092-8AE5-

6A2A3EBBF537/0/FLG08_English.pdf. *Bodega Dreams* is also listed among works of fiction

used in advanced-level English as a Second Language courses at the New York City Department

of Education's Belmont Preparatory High School. *See* Belmont Preparatory H.S., *2008-09*

*School Comprehensive Educational Plan* 29 (Updated Oct. 2008), *available at*

http://schools.nyc.gov/documents/oaosi/cep/2008-09/cep_X434.pdf; *see also* Karen Pasternack,

*Educators defend use of popular literature*, The Journal News (Westchester County, N.Y.), Nov.

26, 2002, at 3B (describing use of, *inter alia, Bodega Dreams* in a Westchester County, N.Y.

public high school). *Bodega Dreams* freely employs explicit, vulgar sexual terms. *See Bodega*

*Dreams*, 3, 4, 9, 10, 37, 200, *passim.*

 *Street Pharm, Snitch, No Disrespect, Bodega Nights*, and similar books are recommended

for young people by some educators in part *because* of their raw language.  Students, particularly

those growing up in disadvantaged urban environments, may engage more readily with works of

literature that treat themes that are familiar to them in a language that is vivid, realistic, and

authentic, rather than stilted or literary. *See, e.g.,* Pasternack, *supra* (noting with respect to

controversy about use of *Bodega Dreams* and other popular literature, that "teachers added that

some children have difficulty reading classic literature.  They want students to read and feel

confident about their connection to literature instead of getting frustrated and turning to

television and film.").  Students interviewed about their experience reading Allison van Diepen's

books, for example, have praised them on the ground that they are written "from a young

person's perspective.  The way they talk is how a young person talks." *See* Robyn Rosenthal,

*Academy's teens inspired by edgy novels*, The Swartz Creek News (Swartz Creek, MI), May 25, 2008, at SC01.

iv.    **Sexually Explicit Terms in Sexuality and HIV/AIDS Education**

Ms. Kramer's lesson was not such a gross deviation from pedagogical norms as to raise questions of the instructor's competence and judgment. There is respectable academic literature supporting what she did in the classroom.

The sociological and pedagogical work on sexuality and HIV/AIDS education emphasizes that lack of familiarity among students with clinical or "correct" sexual terminology can be a source of confusion and embarrassment, and an obstacle to effective instruction. Many authorities suggest that engaging directly with student language, including colloquial, slang, and vulgar vocabulary, is a legitimate and effective method of opening up lines of communication concerning sensitive subjects and establishing rapport with students. These conclusions are consistent with, and reinforce, teaching advice provided in the Board's own HIV/AIDS Curriculum.

Scholars and sexuality and HIV/AIDS educators have repeatedly observed that many students are unfamiliar at the outset with socially appropriate or clinical terms for sexual anatomy and behavior. "For many students and participants . . . using correct clinical terms to describe reproductive anatomy and sexual behavior will be a new experience." Glen G. Gilbert, Robin G. Sawyer, & Elisa Beth McNeill, *Health Education: Creating Strategies for School and Community Health* 388-89 (3d ed. 2009). Students "may not know the proper name of a body part and so call it by its slang name." Clint Bruess & Jerrold Greenberg, *Sexuality Education: Theory and Practice* 56 (5th ed. 2009). Ignorance results from a widespread cultural reticence regarding sexual topics:

– 47 –

> Most children (and adults) were taught to describe their genital areas and body functions euphemistically (e.g., "down there," "wee wee"), later substituting whatever slang was used by peers. Even adults rarely know or feel comfortable using correct sexual terminology. Learners often worry they will use incorrect words or say something considered offensive to others, which prevents them from asking important questions or contributing ideas.

Evonne Hedgepeth & Joan Helmich, *Teaching About Sexuality and HIV: Principles and Methods for Effective Education* 49 (1996) (noting that "students may use offensive terms to test [the instructor], or it may be that they simply know no other words to use").

Because many students often encounter slang and non-clinical terms for sexual concepts in informal settings, the meanings of such terms are of direct interest to them. Hedgepeth and Helmich report the results of a study showing that the meanings of slang terms are a subject of curiosity among students, especially those of middle-school age:

> A 1987 study examined differences in questioning behavior among seventh, eighth, and tenth grade boys and girls and found that younger students had more questions about biology, intercourse, and *clarification of slang terms*, while older students were more interested in learning about birth control, health risks, and communication. Also, boys in general were *more curious about slang* and intercourse while girls were more interested in communication, relationships, and health risks.

Hedgepeth & Helmich, *supra*, at 94 (emphases added).

Other studies of students in this age group have produced similar results. A questionnaire answered by 13- and 14-year-old British students indicated that "44% of girls and 48% of boys agreed or strongly agreed that they would like more information about 'what people do when they have sex.' . . . A third of questions on this topic asked for *clarification of slang terms* for a variety of sexual activities and practices[.]" Simon Forrest, Vicki Strange, Ann Oakley & the Ripple Study Team, *What Do Young People Want from Sex Education? The Results of a Needs*

*Assessment from a Peer-Led Sex Education Programme*, 6 Culture, Health & Sexuality 337, 346 (2004) (emphasis added).

Students who are not familiar with clinical sexual terminology may be forced by their own ignorance of all but street language to resort to colloquial, slang, or vulgar language in the classroom if they are to participate in the discussion. It is therefore important for the instructor to become familiar with students' vocabulary, so that communication can proceed effectively:

> [I]f learners continue to use slang and profane terms, without knowing them well, it will be difficult for you [the instructor] to determine whether their intent is to shock you or whether such language is their vernacular—their standard language usage. Further, some learners may ask seemingly ridiculous questions that you must evaluate to answer. Are the questions asked to shock you? Are they asked out of ignorance or curiosity? At what level (depth and breadth) should the questions be answered?

Bruess & Greenberg, *supra*, at 188.

A frequently endorsed technique for improving understanding and communication between instructor and students is to address informal and slang terminology by explicitly "translating" it into appropriate or clinical terms for students' benefit:

> Because there are so many different cultures in the United States, slang terminology will be extremely varied; therefore, if slang is used, communication becomes very complicated. There is nothing wrong with addressing the slang issue early in the class or presentation, where "translations" can be made and the correct terminology established.

Gilbert et al., *supra*, at 388-89. Hedgepeth and Helmich similarly recommend "[m]ak[ing] the link between medical and colloquial terms," and "translat[ing] student slang into correct terminology." Hedgepeth & Helmich, *supra*, at 49. Those tasked with evaluating sexuality educators are advised to assess whether they competently "[i]dentif[y] slang as such (without judgment, except when a term is derogatory) and translate[ ] to standard or medical

terminology." *Id.* at 249; *cf.* Jane Lewis & Trudie Knijn, *Sex Education Materials in the Netherlands and in England and Wales:  A Comparison of Content, Use and Teaching Practice*, 29 Oxford Rev. of Ed. 113, 121 (2003) ("A biology lesson observed in Utrecht opened with a frank discussion of different names for genitals, *slang words for intercourse*, and how men and women talk about sex differently. This might happen in a PSE [Personal & Social Education] lesson in England[.]" (emphasis added)).

Sex education literature emphasizes the sensitivity of the subject of sexuality and related topics like HIV/AIDS.  An important goal of instruction in these areas is to put students at ease and overcome inhibitions that may obstruct efforts to communicate and teach effectively. Addressing differences in language directly can help to establish rapport between instructor and students, prevent embarrassment, and encourage open discussion.  For example, researchers collecting data about sexual practices from groups of British 15- and 16-year-olds made "socializing the first issue for discussion to ensure that disclosures on sexuality were contextualized in the broader landscape of young people's lives."  Julia Hirst, *Researching Young People's Sexuality and Learning About Sex:  Experience, Need, and Sex Relationship Education*, 6 Culture, Health & Sexuality 115, 116 (2004).  Making socializing a topic of discussion "provided time for familiarity with languages, *dialects and slang*," which helped to open the channels of communication:  "This meant that when sexual behaviors were introduced, both respondents and researcher had 'tested the waters,' and were more confident to check out meanings and inferences, without risking premature termination of the discussion or undue embarrassment.  Within a relatively short period of time, discussion became fluid and relaxed." *Id.* at 116-17 (emphasis added).

– 50 –

Some experts advocate that instructors themselves use colloquial or slang terms to establish rapport with students. *See, e.g.*, Mary Jane Kehily, *Sexuality, Gender and Schooling: Shifting Agendas in Social Learning* 196-97 (2002) (noting that one observed instructor's "ability to communicate with pupils was enhanced by his use of colloquial terms and regional dialect . . . . His willingness to use the language of pupil cultures, particularly in relation to sexuality . . . offers a compelling mode of engagement for students."). Exercises like the one used by Ms. Kramer to elicit sexual terms from students have been encouraged by experts in teaching. For example, one text reports:

> Over the years, one of the most popular activities in college sexuality courses has focused on awareness and comfort with sexual terminology. In class, students might be asked to shout out synonyms and slang terms for genitals and for various sexual activities. Alternately, students might be divided into small groups that compete at drawing up lists of such terms. *These exercises highlight some of the difficulties of communicating about sexuality, and they also act as social icebreakers among students.*

James W. Maddock, *Sexuality Education in Postsecondary and Professional Training Settings* 73 (1997) (emphasis added).

Other authorities do not advocate use of colloquial language by the instructor, but advise teachers to "[e]xpress [ ] anticipation of and sensitivity to student discomfort with sexuality or with certain topics" and to "[d]emonstrate your comfort with hearing sexual slang [and] translating it into correct terminology." Hedgepeth & Helmich, *supra*, at 42. Flat refusal to engage with certain terms or topics is discouraged because it can indicate to students that sexual concepts are shameful or off-limits. When students use inappropriate terminology it is recommended that:

> Your [the instructor's] responsibility in such instances is to identify the correct terminology, without embarrassing the person asking the question, and then answer the question. The important

thing to remember is that you want to educate those with whom you are working. *To inhibit their questions by requiring certain language or by identifying some topics as off-limits is to limit the amount of learning that can occur.* If you remain focused on open and clear communication and are careful to avoid reinforcement of a student's inappropriate behavior, then the stage will be set for learning. Certainly, there may be limits placed on you by others who administer your institution, school, or organization, and you will have to function within those limits. *However, you should not create further unreasonable limits because you are uncomfortable discussing sexuality in group settings.*

Bruess & Greenberg, *supra,* at 56 (emphases added).

The lesson plan in the Board-issued HIV/AIDS Curriculum for the lesson Ms. Kramer was teaching acknowledged and addressed the issues raised in the sociological and pedagogical literature in its "Teacher Note," set out in Part I, *supra*. It acknowledged: "[In] HIV/AIDS education, it is important that students understand the terms used in the classroom, use them correctly, and *relate them to their own experience and language*." Ozgu Decl. Ex. D at D00433 (p. 129) (Grade 8, Lesson 2) (emphasis added). The official lesson plan implicitly recognizes that students may use nonstandard language, and may not understand polite or Latin terms used by the more educated and mature. It enjoins teachers to "make sure [students] understand the relationship between both sets of terms," similar to the "translation" approach advocated by many experts. *Id.* The lesson plan also acknowledges the sensitivity of the topic and the likelihood that some students will feel uncomfortable and embarrassed, but it emphasizes the importance of communicating information to students, even at the expense of some discomfort. *See id.* ("[I]t is understandable that some people may feel embarrassed. Nevertheless, it is important to know the facts."). The Curriculum's introductory materials also discuss this issue. *Id.* at D 00405-06; *see* Part II, *supra*. Included in the HIV/AIDS Curriculum were optional

– 52 –

vocabulary-building exercises based on brainstorming and "semantic associations," similar in format to the exercise Ms. Kramer led. *See* HIV/AIDS Curriculum at 309-10; Part II, *supra*.

The message of the HIV/AIDS Curriculum, and of the scholarly and pedagogical works on sex education discussed above, is consistent with Ms. Kramer's rationale for eliciting sexually explicit terms from students:  She intended "to simplify the lesson plan," and "felt that by allowing students to participate in the lesson using slang terminology it would eliminate the students' curiosity of the terms in the future."  Ozgu Decl. Ex. P at D 00634 (Sept. 29, 2008 letter from principal to Ms. Kramer).

If young students are prevented from candidly consulting their sex and HIV/AIDS education instructors in terms and concepts they understand and use, it is not clear to what other reliable resource they can turn.  Central to the discussion of HIV/AIDS is the act of sexual intercourse or coitus—to use two terms acceptable among the sophisticated in a mixed group.  A student researching these or other terms for the act on her own is likely to find little that relates to the language she and her peers use, but many abstruse terms and expressions that she probably has never encountered before.  For example, the *Oxford English Dictionary* defines "coitus" or "coition," as: "Sexual conjunction, copulation" (definition 2 of "coition"); "copulation" is defined as "The union of the sexes in the act of generation" (definition 2); "intercourse" as "Sexual connection" (definition 2.d).

The most useful thesaurus provides the following synonyms under the heading of "copulation": copula, coupling, mating, coition, coitus, venery, intercourse, commerce, congress, sexual intercourse, sexual commerce, sexual congress, sexual union, sexual relations, relations, intimacy, connection, carnal knowledge, aphrodesia, fornication, and love.  *Roget's International Thesaurus* §168.3 (3d ed. 1962).  Another thesaurus provides a few "idioms" for "copulate," but

they seem unlikely to clarify the concept to a contemporary young person. It offers: "to engage in sexual relations with: bed, couple, have, mate, sleep with, take. *Idioms:* go to bed with, make love, make whoopee, roll in the hay." *Roget's II; The New Thesaurus* (3d ed. 1995). Reliable online resources provide similar results. *See, e.g.,* Thesaurus.com, *at* http://thesaurus.com/browse/coitus (defining "intercourse" as the "sexual act" and offering the following synonyms: carnal knowledge, coition, coitus, copulation, fornication, intimacy, love-making, relations, sex, sexual relations).

Other internet resources—including general search engines like Google, online informal slang "dictionaries" like Urban Dictionary (urbandictionary.com), and a vast array of websites and online research tools—are of highly uneven quality, and may lead students to materials that are inaccurate, obscene, misogynistic, or simply pornographic, rather than to reliable, helpful explanations. Internet searches using explicit sexual terms can lead unwary researchers inadvertently to images, videos, and other content that are not age-appropriate or that, in the case of pornography, may subject unsuspecting browsers to harsh legal penalties. *See, e.g.,* 18 U.S.C. § 2252(a)(2) (receives visual depiction of child pornography by computer); *id.* § 2252(b)(1) (imprisonment of not less than five years).

Frank discussion of sex and HIV/AIDS in the classroom may be the most accurate, reliable, and safe source of knowledge and understanding for many students of this age. Whether a school system restricts or inhibits such discussion is for school officials to determine as a matter of policy; the Board has that power. But administrators cannot decide *post hoc*, without justification in any stated school rule or policy, to censure an experienced teacher for conducting candid discussions with students, particularly when it impinges on the teacher's

– 54 –

professional reputation, her standing within the school and the larger community, and her supplemental compensation.

### c.   Explicit Standards for Application

"[A] rule must both provide adequate notice to those who are governed by it *and* adequately cabin the discretion of those who apply it" in order to survive a vagueness challenge. *Farid*, 593 F.3d at 243 (original emphasis).  The findings that Chancellor's Regulation A-421 did not cover Ms. Kramer's conduct, and did not provide her with a reasonable opportunity to know that her actions were prohibited, are sufficient basis to deny summary judgment with respect to her due process claim on vagueness-notice grounds.  It nonetheless warrants emphasis that, even assuming that Regulation A-421 covered Ms. Kramer's conduct, as applied it did not "adequately cabin the discretion of those who apply it." *Id.*

The facts of Ms. Kramer's conduct were substantiated by an OSI investigator, whose findings were accepted by the principal of her school.  The principal, in his September 29, 2008 letter, applied Chancellor's Regulation A-421 to those findings, concluding that Ms. Kramer had violated the regulations by causing the students "mental distress," leading to the possibility of further future sanctions. *See* Ozgu Decl. Ex. P (Sept. 29, 2008 letter from principal to plaintiff) ("By writing sexually explicit terms on the blackboard and directing students to copy these terms down, you caused students to experience mental distress and you violated Chancellor's Regulation A-421.  This incident may lead to future disciplinary action[.]").

In concluding that Ms. Kramer had violated Regulation A-421, it appears that the principal acted under the assumption that he had "almost complete enforcement discretion" in construing the regulation. *Farid*, 593 F.3d at 243.  Under this reading of the regulation, it "contained no explicit standards and placed unfettered discretion in the hands of" the principal. *Id.*  In particular, the "mental distress" language was treated as a "catch-all" provision that

– 55 –

allowed the principal "to determine in [his] unbounded discretion what was and was not"

permitted and prohibited. *Id.* Given such lack of constraints on the enforcing official,

Regulation A-421 failed to adequately constrain or define the principal's discretion. *See id.*

("[T]he catch-all contraband rule allowed prison officials to determine in their unbounded

discretion what was and was not" authorized in the facility.). Chancellor's Regulation A-421

was unconstitutionally vague as applied. *See, e.g., United States v. Polouizzi,* --- F.Supp.2d ----,

No. 06-CR-22, 2010 WL 1048192, at *4 (E.D.N.Y. Mar. 23, 2010) ("In an as-applied challenge,

the question is whether the statute would be unconstitutional if applied literally to the facts of the

case.").

Judicial review of school administrators' action is not to be treated as "an invitation to the

courts to substitute their own notions of sound educational policy for those of the school

authorities which they review." *Wasser v. N.Y. State Office of Vocational and Educ. Servs. for*

*Individuals with Disabilities et al.,* --- F.3d ----, No. 08-4724-cv, 2010 WL 1688416, at *3 (2d

Cir. Apr. 28, 2010). The constitutional flaw lies not in the substance of the policy applied by the

principal, but in the absence of such an expressed policy. As already pointed out, limits on

language used in HIV/AIDS lessons would likely be constitutionally permissible. But in this

case there was no applicable school or Board policy regarding the words used in Ms. Kramer's

lesson.

### d.    Regulation A-421 Was Applied to Ms. Kramer

By order of April 6, 2010, the court directed the parties to address the question "whether

Chancellor's Regulation A-421 was specific enough to satisfy notice and the other requirements

of due process" (citing *Farid v. Ellen,* 593 F.3d 233, 240-44 (2d Cir. 2010)). In a subsequent

submission, the Board took the position that this question is not relevant to plaintiff's claims, and

distinguished the *Farid* decision:

In *Farid*, the plaintiff had disciplinary charges against him *sustained, after a hearing*, for violating prison rules governing "contraband" and "smuggling." The Second Circuit found that the plaintiff's rights had been violated by the application of an unconstitutionally vague prison regulation.   In contrast, here, plaintiff was never brought up on disciplinary charges for violating Chancellor's Regulation A-421.  Had plaintiff been brought up on charges under New York Education Law § 3020-a, which sets forth the disciplinary procedures for tenured teachers, she would have been entitled to a due process hearing during which she could have raised an argument regarding whether the conduct for which she was charged constituted verbal abuse under Chancellor's Regulation A-421.

Def. Reply Mem. at 3 n.2 (original emphasis; citation omitted).  The Board's position appears to be that, because formal disciplinary proceedings under Education Law section 3020-a were never initiated, Chancellor Regulation A-421 was never actually *applied*.  On this view, there would be no basis for an as-applied notice or vagueness challenge to the regulation.

Under the circumstances of the instant case, this formalistic argument unduly narrows the scope of constitutional protections.  The adverse consequences suffered by Ms. Kramer were significant: she was denied teaching duties for eight months, sent to non-teaching detention, investigated, determined by her principal to have violated Regulation A-421, denied a satisfactory rating for the school year, and deprived of the extra income she had previously been earning from per session assignments.  This appears to constitute a significant deprivation of her constitutionally protected interest in her employment.  *See* Part IV.B.1.  In this situation these measures are sufficiently serious to be considered in the nature of sanctions, rather than merely measures in service of an appropriate investigation.  They were justified, ultimately, on the ground of Ms. Kramer's purported violation of Regulation A-421.  A teacher is constitutionally entitled to notice that her conduct might run afoul of the regulation.  Such notice was lacking.

The Contract appears to invest school officials with the discretion to remove teachers from the classroom pending an investigation in preparation for formal disciplinary charges under Education Law section 3020-a. *See* Ozgu Decl. Ex. M at D 00582 (p. 115) (Art. 21G ¶ 4); Part II, *supra*. In many instances it may be necessary and appropriate to suspend a teacher before the nature of potential disciplinary charges are understood in order to investigate what happened and which school regulation or regulations, if any, may have been violated. It would be unreasonable to require administrators to know with precision, in all cases, prior to any exercise of their authority to reassign a teacher, which school regulations might apply to the conduct at issue.

But, in view of the serious consequences that attended the suspension and investigation of Ms. Kramer, due process required that school officials have had *some* basis to believe that there may have been a violation of an identifiable school rule or policy. Without such a nexus to stated rules, a conscientious, rule-abiding teacher may suffer serious sanctions at the whim of supervisors, on the basis of conduct with no conceivable relation to any arguable violation. This would deny adequate notice of the nature of the conduct to which sanctions attach.

The fact that the regulation initially invoked to justify Ms. Kramer's removal from the classroom—Chancellor's Regulation A-420, prohibiting "corporal punishment"—was clearly not applicable, demonstrates that school officials had identified no plausible connection between her conduct and any school rule. The principal and other decision makers appear to have acted out of a wish to respond to parent complaints about the content of Ms. Kramer's lesson. But such concerns do not suspend constitutional notice requirements. Under the specific circumstances of this case, in view of the seriousness of the consequences suffered by the plaintiff and the complete lack of any plausible basis in school rules for a disciplinary investigation, there was a violation of the constitutional requirement of adequate notice.

– 58 –

### C.    State-Law Claims

#### 1.    Breach of Contract

Plaintiff's breach of contract claim is barred because she has not exhausted her administrative remedies under the Contract. "Generally, an employee covered by a collective bargaining agreement which provides for a grievance procedure must exhaust administrative remedies prior to seeking judicial remedies." *Spano*, 61 A.D.3d at 670-71.

The Contract contains detailed grievance and arbitration procedures governing complaints of violations of the Contract. *See* Ozgu Decl. Ex. M at D 00589-602 (p. 122-35) (Contract Art. 22). Ms. Kramer initiated one relevant grievance concerning the denial of ELA exam scoring. Arbitration with respect to that grievance remains pending. Hr'g Tr. 16-17. No other grievance relating to the February 2008 suspension or its consequences has been made by Ms. Kramer.

#### 2.    Negligent Supervision

Ms. Kramer alleges that the Board "failed to properly train and supervise its administrative staff to protect the constitutional rights of its tenured teachers." Amend. Compl. ¶ 17. She fails to allege—and there is no evidence in the record to suggest—that the Board "knew or should have known" of any administrative staff person's "propensity for the conduct which caused the injury," a necessary element for a negligent supervision claim under New York law. *See, e.g., Bumpus*, 47 A.D.3d at 653. No evidence has been offered that tends to show that any of the administrative personnel involved in the measures taken against Ms. Kramer had a propensity to commit relevant deprivations of constitutional rights, or that the Board had any basis for knowing of such propensities. Dismissal of plaintiff's negligent supervision claim is warranted.

V.      **Conclusion**

The Board's motion for summary judgment is denied with respect to plaintiff's claim of unconstitutional vagueness and inaptness of Chancellor Regulation A-421 as applied to her conduct. The claims for expungement of records, loss of per session compensation, and attorney's fees and costs remain. In other respects the defendant's motion for summary judgment is granted.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Date:   May 20, 2010
        Brooklyn, New York

– 60 –